**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 29, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CLARENCE ROZELL GOODE, JR.,

     Petitioner - Appellant,

v.

MIKE CARPENTER, Warden, Oklahoma
State Penitentiary,

     Respondent - Appellee.

No. 16-5124

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:11-CV-00150-GKF-FHM)**
_____

Thomas D. Hird, Assistant Federal Public Defender (Emma V. Rolls, Assistant Federal
Public Defender, with him on the briefs), Oklahoma City, Oklahoma, for Petitioner-
Appellant.

Jennifer L. Crabb, Assistant Attorney General (Joshua L. Lockett, Assistant Attorney
General, and Mike Hunter, Attorney General of Oklahoma, on the brief), Oklahoma City,
Oklahoma, for Respondent-Appellee.
_____

Before **BRISCOE**, **HARTZ**, and **PHILLIPS**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

     Clarence Rozell Goode, Jr., who was convicted of first-degree murder and

sentenced to death by the State of Oklahoma, appeals the denial by the United States

District Court for the Northern District of Oklahoma of his application for relief under 28 U.S.C. § 2254. Goode's application raises two claims: (1) a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), that the State suppressed material information about the corrupt conduct of Jeff Henderson, one of its investigating officers, and (2) an ineffective-assistance-of-counsel claim with numerous subclaims. Because none of Goode's claims merits relief under § 2254, we affirm the district court's denial of the application.

## I. BACKGROUND

The strength of the evidence of Goode's guilt is important in resolving several issues on appeal, in particular the *Brady* issue. We therefore review that evidence in some detail.

During the overnight hours of August 25–26, 2005, intruders entered the home of Mitch Thompson and his wife Tara Burchett-Thompson at 9707 North 112th East Avenue in Owasso, Oklahoma. (For convenience we will refer to it as Tara's home.) Tara's ten-year-old daughter Kayla, who lived with her grandmother Brenda Smalygo at a separate address, happened to be staying with her mother that night. All three occupants were murdered. The crime was discovered about 9:00 a.m. on August 26, when Ms. Smalygo learned that Kayla was not in school and came by the house to check on her. She observed that the garage door was open, as was the door from the garage into the house. She found Tara and Kayla nonresponsive in the bedroom and called the police, who later found Mitch's body in that room.

Evidence recovered from the crime scene and forensic examination showed that the victims had been killed by shots from three firearms—a .22, a 9mm, and a .357. Seven .357 casings and seven 9mm casings were found at the crime scene. A .22 caliber projectile was found in a dresser drawer. In addition, six projectiles were found in and under the bed. The ballistics expert determined that at least three of those projectiles came from the .357, and one came from the 9mm. The origin of the other two projectiles could not be determined.

Mitch was shot at close range once in the upper back and once in the cheek. No bullets were recovered from his body, but one of the .357 projectiles found under the bed was directly beneath his head.

Tara's body had 10 gunshot wounds: three on the head, two on the chest, one on the abdomen, two on the leg, one through the arm, and one through the hand. The medical examiner observed that five or six shots entered and fully exited her body. Four bullets were recovered from Tara's body—one from her head and three from her body cavity—all of which came from the 9mm gun. One of the .357 projectiles was found beneath her head.

Kayla was shot once in the head, once in the back, and three times in the hip. Three bullets lodged near her hip were recovered; one came from a .22, and two were from the 9mm. Kayla's head wound was not attributed to a particular weapon, but seven 9mm casings were found, and seven 9mm shots were accounted for. And the wound was not of the distinctly smaller sort attributable to a .22. Based on the above evidence, the State theorized that shots from the .357 gun caused the head wounds of all three victims.

3

Three neighbors testified for the prosecution at trial. James Deeter said that at 12:12 a.m. on August 26 he took out his garbage and noticed that the Thompsons' garage door was open, but the interior door from the garage into the house was "definitely closed." Trial Tr. Vol. III at 606. He and his wife both described loud barking coming from the side of their yard adjacent to Tara's home at about 12:45 a.m. Another neighbor was awakened close to that time but could not state the cause.

A possible motive for the murders was a feud involving Mitch. On one side of the feud were Mitch and a family friend, J.R. Hoffman, who usually spent the night at Tara's home or the home of Mitch's parents. On the other side were Mitch's sister Michelle Chastain; his cousin Ronald Thompson (called "Bunny," because he was born on Easter), who lived with Michelle; and Goode, who was Michelle's boyfriend. At trial, Michelle and Bunny testified to the events of the feud, with some corroboration from others, including a statement by Goode to the police. The gist of the events is not disputed and was endorsed in the defense closing argument.

About July 14, 2005, Goode gave J.R. money to run an errand for him in Claremore, Oklahoma. J.R. borrowed Michelle's car for the trip. He wrecked the car and was arrested for driving under the influence. When they learned that J.R. was in jail, Mitch's mother and Bunny bailed him out. Goode and Bunny retrieved the car, which was badly damaged.

Two weeks later, Bunny and Goode confronted J.R. at the home of Mitch's parents. Goode demanded that J.R. pay for the damage to the car, J.R. refused, and Goode punched him in the mouth. Goode and Bunny left and went to Michelle's house.

4

Goode's friend Damos "Peanut" Joseph came to that house and gave Goode a handgun, which Goode tucked into his pants. Meanwhile, Mitch's mother drove J.R. to Tara's house because he was drunk and acting erratically.

Later that night, Michelle heard a knock at her door. She and Bunny went to answer it and found Mitch accompanied by J.R. and armed with a baseball bat. Mitch began attacking Bunny with the bat. He was badly beating Bunny when Michelle called for Goode, who emerged from a bedroom carrying a gun. Michelle had never seen Goode with a gun before that night and did not know where he obtained it.

Goode ordered everyone outside. But Mitch continued to beat Bunny, while J.R. pointed at Goode and yelled "I want this motherfucker right here." Trial Tr. Vol. V at 1022. About this time, Peanut joined the group in the yard. Goode handed Peanut his gun and engaged in a fistfight with J.R, which he won. An ambulance was called for Bunny, who suffered a broken rib from the beating with a bat.

After this incident, Mitch called the child-welfare division of the Oklahoma Department of Human Services (DHS) to say that Michelle had not reported the income of people living in her home. DHS initiated an investigation and scheduled a home visit. Mitch also called the dental office where Michelle worked and said that she was involved with drugs, causing her to be fired. He similarly attempted to get Goode fired from his job as an aide at Brookhaven Hospital by reporting to the hospital that he was selling drugs, but this effort was unsuccessful.

At Goode's trial, two witnesses gave accounts of the murders. One, Bunny Thompson, confessed to participating in the crime. On August 25 he reported to his

5

usual job as a cart puller at Walmart. Because his car was inoperable, he was driven to work by his uncle, Mitch's father. Not long before 10:00 p.m. his boss told him to leave the store, but did not fire him, for taking Xanax at work. Bunny tried calling Michelle to pick him up but could not reach her, so he called Goode to get a ride home. Goode said he was already coming to Walmart and could pick him up. He arrived at Walmart with Kenneth "Fu Fu" Johnson in Johnson's white four-door Mercury Marquis. The two men did some shopping at the store and then connected with Bunny, who had never met Johnson before.

Bunny got in the car with Goode and Johnson. He sat in the back, Goode sat in the front passenger seat, and Johnson drove. As they departed, Goode told Bunny they were going to "take care of some business." Trial Tr. Vol. V at 909–10. He gave Bunny a .22 gun and latex gloves. At trial Bunny first described the gloves as "yellow ones, like the doctors use" but then said they were clear. Trial Tr. Vol. V at 910. Johnson had a 9mm gun and Goode had a .357. Bunny put on the latex gloves, and Johnson and Goode put on both latex gloves and another set of gloves, which Bunny first described as "[l]ike batting gloves" and then as "painter gloves" that were "blue on the outside." Trial Tr. Vol. V at 911–12. Bunny testified that they then drove straight to Tara's home, though the State said that the murders did not occur until later that night. Bunny said that when he left Walmart with Goode and Johnson, he took some ecstasy in Johnson's car, which, combined with Xanax, muddled his recall.

When the three men arrived at Tara's house, Bunny rang the doorbell. Getting no response, he went through the open garage door and kicked in the interior door to the

6

house. He went to the left, heading for the room where J.R. regularly stayed. Goode and Johnson went to the right, to Mitch and Tara's bedroom. Bunny heard gunshots coming from that bedroom and went there, where he found Goode and Johnson shooting. Johnson held his gun to Bunny's head and demanded that he start shooting or he would "be next." Trial Tr. Vol. V at 917–18. Bunny fired three or four shots into the wall over the bed. He admitted that he "might have shot" Kayla in the hip as he "raised up the gun." Trial Tr. Vol. V at 923. Bunny then ran out of the home, with Goode and Johnson behind him.

The three headed to the home of "Peanut" Joseph. While driving there on Highway 169, they threw their gloves out the car windows. Upon arriving at Peanut's, Goode told Bunny to "get rid of the bullets" from his gun. Trial Tr. Vol. V at 925. Bunny gave his gun to Goode and then tossed what he said were the bullets "outside in a field." Trial Tr. Vol. V at 925. (It is possible that Bunny was referring to the casings, not the bullets themselves. The .22 was the only gun used in the murders to retain its casings; the other two firearms were automatic weapons, so their casings were automatically discharged upon firing.)

Later that morning, Bunny awoke at Michelle's house, where someone picked him up and took him to his sister's home. The next day, August 27, Bunny confessed to his sister "what all happened," and she drove him to the police station.[1] Trial Tr. Vol. V at 929.

---

[1] Bunny's sister, Tressa Beasley, testified that on August 26 Bunny came to her home from Michelle's house and spent the night. He told her that Mitch and his family were in

In his interview with the police, Bunny at first denied involvement in the shootings. Although he admitted that he got in the car with Goode and Johnson, he said that after they pulled into Tara's neighborhood and showed him the gloves and guns, he got out of the car but did not enter Tara's home. Then he admitted entering Tara's home but claimed he did not have a gun. He initially said that Johnson kicked in the door to the home, but then admitted that he was the one who had done so. He then modified his account once again, admitting to using a .22 caliber gun to fire shots into a wall at the home. And when officers told Bunny that a .22 bullet was recovered from Kayla's hip, he admitted that one of his shots might have hit her. In exchange for Bunny's testimony, the State withdrew the death penalty in his case.

The other account of the murders came from Michelle Chastain, who described two occasions on which Goode confessed to the murders. Goode woke her up at her home at 4:18 a.m. on August 26. He rubbed her face and then went to the other side of the bed. Michelle told him she had called and left messages on his phone several times that evening and accused him of being with another woman. They argued until Goode shouted out, "I just shot your fucking brother, is that what you wanted to hear?" Trial Tr. Vol. V at 1043.

Michelle did not take his statement about her brother seriously because Goode immediately changed the subject, talking about jerseys that his "cousin" Fu Fu (Johnson)

_____

the hospital. But when she learned from her mother that they had been murdered, she confronted him and told him to tell her the truth about what had happened. After he responded (she did not testify about the contents of his statement) she told him he needed to turn himself in and drove him to speak with the police.

8

had given him. About this time, Michelle heard the microwave in the kitchen and assumed it was Bunny. But Goode explained that it was Johnson, who then came to the bedroom. Michelle got out of bed and Goode introduced Johnson to her as his cousin. Michelle had never met Johnson before that night. Johnson asked Michelle to get Bunny's stuff out of his car. She followed Goode and Johnson outside and saw a four-door vehicle, which she had never seen until that night, parked curbside with Bunny lying beside it unconscious. She took Bunny's bag out of the backseat of the car and helped take Bunny to the guest room, where he often stayed.

Sometime before 6:00 a.m., Johnson left, followed shortly thereafter by Goode. Before he left, Goode told Michelle to watch the news. Michelle did not know how Goode got home; she did not recall seeing Goode's truck outside her house, but said it was possible the truck was there. Later that morning, Goode, his friend Peanut, and another man came to Michelle's to help clean up her home for the DHS inspection scheduled for that day. Goode then left to visit his brother in prison.

Michelle learned of the murders the early afternoon of August 26 when Detective Jeff Felton and a police chaplain came to her home. Until then she had not known that anyone had actually been killed. She soon learned that her father had suffered a heart attack upon hearing of the murders, and she went to the hospital to be with him. While there, she spoke with Detective Felton and Officer Mike Denton. During this time, Goode called her to say she was "making him nervous." Trial Tr. Vol. V at 1059. She said nothing to the police implicating Goode.

9

She again spoke with Goode in the early morning hours of August 27. After he threatened to come to the hospital, she agreed to meet him at a Denny's restaurant instead. At Denny's, Goode told Michelle that her brother was a "punk and a coward" and further described the murders. Trial Tr. Vol. V at 1061. Goode told Michelle that on the night of the murders he, Johnson, and Bunny went to Tara's home and waited outside for the occupants to fall asleep. The garage door had been left open. When they decided to go in, Bunny kicked in the door from the garage to the house, leaving a footprint. Bunny was supposed to go to J.R.'s room, but instead came up behind Goode and Johnson and shot Kayla. As they were leaving the home, Goode heard something move. He turned on the lights and saw Mitch—who had previously been shot—trying to crawl away. Goode went over to Mitch and demanded that he look him in the eye, but he did not do so. He told Mitch that he should have "never snitched" on him and he should "die like a bitch." Trial Tr. Vol. V at 1062. He then shot Mitch again. Goode claimed that he shot Mitch eight times and that Johnson shot Tara. He and Johnson would have shot Bunny, but he took off running. Goode had a shotgun and Bunny had a .22.

Michelle gave two recorded statements to the police. On August 27 the police asked to speak with her, and she came to the police department. She was first interviewed by Detective Sonya DeArmond, who was essentially stalling for time until Officer Denton—who had been at the crime scene and was thus familiar with the case—returned to the police department from another assignment. DeArmond asked Michelle about the baseball-bat incident, and she said that Goode did not have a gun during that encounter. She did not tell DeArmond about Goode's confession or his involvement in

10

the murders, or that she had seen Goode during the early morning hours of August 26. Denton continued the interview once he arrived at the police department.

Because the audio quality of the August 27 interview was poor, Denton interviewed Michelle again on August 30. (Denton did not testify about what Michelle told him on August 27.) At this interview—which occurred after Goode had been arrested—Michelle told Denton of Goode's confession to her. At trial the defense pointed to several inconsistencies between what she said at her August 30 interview and her trial testimony. In the interview, for instance, Michelle said that she first saw Bunny on August 26 when she woke up in the later morning hours, not when she went outside to Johnson's car. Also, she said that Goode confessed to her at her home, and they went to Denny's only after his confession. On the other hand, there is one indication that she was not distorting her account of the confession to fit what she later learned about the crimes: during the interview she expressed surprise at Goode's claim that he had shot Mitch eight times, because she had seen on the news that it was Tara, and not Mitch, who had been shot multiple times.

The accounts of the murders given by Michelle and Bunny were corroborated by a variety of other evidence at trial. To begin with, a Walmart security video showed Goode, Johnson, and Bunny leaving the store where Bunny worked at about 10:00 p.m. on the night of August 25. They departed in a white four-door vehicle that looked like Johnson's Mercury Marquis.

Also supportive were records of Goode's cell-phone activity, which were obtained by an investigator for the defense at least five months after the murders and introduced by

11

the defense at trial. They showed very frequent calls throughout August 25, but no activity from 11:48 p.m. to 1:03 a.m. The call at 1:03 a.m. was placed to the phone of Damos "Peanut" Joseph, who, according to Bunny's statement to the police a few days after the murders, was the person with whom the murder weapons were left promptly after the crime.

Detective William Mozingo, who investigated the murders, provided corroboration on three points. Two involved the crime scene. He testified that officers found a partial footprint on the door from the garage into Tara's house, corroborating Bunny's testimony and Goode's confession to Michelle that Bunny kicked in the door to the home. And he said that he observed two small holes in the wall in the Thompsons' bedroom, supporting Bunny's account that he shot the .22 into the bedroom wall.

The third item of corroborating evidence related to the gloves mentioned by Bunny. On August 30 officers searched a four-mile stretch of Highway 169 for "[a] latex glove and blue knobby work glove." Trial Tr. Vol. VI at 1263. In a grassy area near an offramp from the highway, Mozingo found a "blue and white work glove," a "latex glove," and a "blue and white work glove encased in a latex glove," supporting Bunny's account that these types of gloves were worn the night of the murders and were thrown out the car window as they left for Peanut's house.[2] Trial Tr. Vol. VI at 1264, 1266–67. Other officers found a portion of a latex glove on the front floor mat of Johnson's

---

[2] In addition, on the side of that highway about a quarter of a mile away, officers found 21 latex gloves, two leather gloves, and two cloth gloves.

Mercury Marquis, and a box of latex gloves in the bed of Goode's truck under a locked cover.[3] Goode had access to latex gloves as part of his job with Brookhaven Hospital.

Further corroborating Bunny's account was the testimony of Officer Jeff Henderson. (Goode's *Brady* claim concerns impeachment of this testimony.) He said that on August 29 he went with other officers to Peanut Joseph's home because of information received from Bunny. He found two .22 casings and one live .22 round in the vacant lot across from Peanut's home.

Forensic evidence partially corroborated Michelle's account of how Goode described his role in the murders. First, a shot was fired through Mitch's cheek at close range, which fit with Michelle's testimony that Goode said he hovered over Mitch and demanded that he look him in the eye as he shot him. Also, seven .357 casings were found at the crime scene, nearly matching Goode's statement to Michelle that he fired his gun eight times (although Michelle reported that Goode told her he had used a shotgun, not a .357). Finally, Goode told Michelle that Johnson shot Tara, and four bullets from the 9mm—the gun Bunny said was used by Johnson—were found in her body.

In addition, a defense witness, Penny Avans, supported the State's theory of the case in important respects. Penny, a friend of Goode and Michelle, was called to testify that Michelle had told her she wanted to kill Mitch after he got her fired and called child services, and that she had heard Michelle tell Bunny where Mitch kept a gun in his

---

[3] Officers also found a brown jersey glove in the backseat of Johnson's car.

home.[4]  But her account of what happened the night of the murders is generally consistent with the other descriptions.  She stated that she was at Michelle's home the evening of August 25, that Goode left around 6:00 or 6:30 p.m., saying that he was going to "take care of some business," Trial Tr. Vol VII at 1497–98, and that when she left Michelle's near 12:10 a.m., Goode had not returned.  She also said that Michelle called her at 3:18 a.m. and told her that she should come over because Goode had brought a good-looking guy named Fu Fu (Johnson) to her home.  (Michelle, however, denied making that call.)  And Penny said that she went to Michelle's house later that morning to pick up Bunny.  When asked whether she thought of Bunny as someone who is easily led by others, she said she did.

Goode did not testify but he gave a statement to police the afternoon of August 28, less than three days after the murders.  Detective Mozingo, who interviewed Goode, testified to the content of his statement.  Goode admitted that he and Johnson picked up Bunny from Walmart on the night of August 25 in Johnson's white vehicle.  He referred to Johnson as his cousin and said that though they were not actually related they had grown up together.  Goode's mother, whom Goode lived with, lived across the street

---

[4]  Penny also claimed that Michelle told her to tell the police that Goode had confessed to Penny, even though he had not done so.  But in the recorded interview with the police on August 30, Michelle said that Penny did not know anything about the murders because she was out of town on the days immediately following the crime.  (Penny testified that she and her husband left on a trip on August 26 (shortly after news of the murders was publicized) and they were out of town until late August 28 or early August 29, by which time Goode had been arrested.)

from Johnson's grandmother. Goode said that he and Johnson were reconnecting on the night of the murders after not seeing each other for a year or two.

Goode at first told police that after he and Johnson picked up Bunny from Walmart, Bunny asked to be dropped off in Mannford (a community about 38 miles away) at the home of a woman who was either his girlfriend or his wife (Goode was unsure who exactly the person was). Johnson drove, and Bunny provided directions. He and Johnson dropped Bunny off (he did not specify where), and Johnson then drove Goode home, where the two conversed. Goode said that he needed to go home because he and his mother were going to visit his brother in prison the next day.

After a break in the interview, however, Goode changed his story. Explaining that he now remembered what had occurred less than three days before, he claimed that after he and Johnson picked up Bunny from Walmart, Johnson dropped Goode at his truck, and Goode drove home. Johnson then took Bunny—whom he had met for the first time that night—to Michelle's house. Back at home, Goode later received a call from Johnson telling him that there was something wrong with Bunny, and Goode then met Bunny and Johnson at Michelle's. When Goode arrived, Bunny "was fucked up," so he pulled Bunny out of Johnson's car and attempted to bring him into the home. Trial Tr. Vol. VI at 1284.

According to Mozingo, Goode "stated that he couldn't see Bunny doing anything like [the murders] . . . . [H]e said something to the effect of he don't have it in him or he don't – doesn't have the heart for it." Trial Tr. Vol. VI at 1287–88.

15

Goode was asked whether he knew Peanut (the person with whom Bunny said the trio stashed their weapons after the murders). He responded that he "kn[ew] a lot of Peanuts." Trial Tr. Vol. VI at 1284. Also, Goode admitted that J.R. had wrecked Michelle's car, that he had previously been involved in a fistfight with J.R., and that Mitch had attempted to get him fired from his job and had successfully gotten Michelle fired.

Goode called two alibi witnesses, but neither could account for his whereabouts after midnight on August 25. Goode's mother saw him at home before 8:00 p.m. on August 25 but knew nothing of his whereabouts thereafter. She said that she had planned to go with Goode to visit his brother in prison early the next morning but admitted that they left for the visit later than expected because she was waiting on Goode.

Ruby Gilyard—the partner of Goode's imprisoned brother who lived with Goode's mother—testified that she saw Goode at his home the night of the murders. He left at 8:00 p.m., but then returned about 11:00 p.m. They conversed for a short time before she went to shower and get ready for bed. When she got out of the shower, she heard Goode rummaging through his things in another room. She did not see or hear from Goode the rest of the night. Neither Goode's mother nor Gilyard saw Johnson at the home that night, as Goode had initially claimed in his statement to police.

On December 13, 2007, Goode was convicted on three counts of first-degree murder and one count of first-degree burglary. The State alleged two aggravating circumstances for each of the three murder offenses: (1) the defendant knowingly created a great risk of death to more than one person; and (2) there exists a probability that the

16

defendant would commit criminal acts of violence that would constitute a continuing threat to society.  The jury found that both aggravating circumstances applied to each murder.  Goode was sentenced to death on each of the murders and 20 years' imprisonment (and a $10,000 fine) on the burglary count.  Goode unsuccessfully appealed the convictions and sentences and filed three applications for postconviction relief in the state court.[5]

## II.    DISCUSSION

### A.    Standards of Review under § 2254

Standards of review of state proceedings under § 2254 are set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA provides for "highly deferential" review of decisions by state courts.  *Hanson v. Sherrod*, 797 F.3d 810, 824 (10th Cir. 2015).  When a state court has considered a claim on the merits, we may grant relief on that claim if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The threshold question for review under § 2254(d)(1) is whether there exists clearly established federal law on the issue raised by the prisoner.  *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) (internal quotation marks omitted).  "The absence of clearly established federal law is dispositive under § 2254(d)(1)" and requires the denial of relief.  *Id*.

---

[5]  Goode raised numerous issues in these state proceedings.  For the sake of brevity, we note only those issues that are relevant to claims raised in this appeal.

17

If such clearly established law does exist, "a state court decision is 'contrary to' it only if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nonetheless arrives at a different result." *Hanson*, 797 F.3d at 824 (brackets and further internal quotation marks omitted). Relief can be provided under the "unreasonable application" clause of § 2254(d)(1) "only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal quotation marks omitted). Thus, a federal court may not grant relief just because it concludes in its "independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (internal quotation marks omitted). Rather, "[i]n order for a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks omitted). To prevail, "a litigant must show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (ellipsis and internal quotation marks omitted). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Relief may also be warranted under AEDPA "if the state court's adjudication of a claim on the merits 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)). "[F]actual findings of the state court are presumed correct unless the applicant rebuts that presumption by 'clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)). "We will not conclude a state court's factual findings are unreasonable merely because we would have reached a different conclusion in the first instance." *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (internal quotation marks omitted).

In reviewing a state court's decision under § 2254(d)(1) or (d)(2), "we must 'limit[]' our inquiry 'to the record that was before the state court that adjudicated the claim on the merits.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *see id.* at n.7 (explaining that § 2254(d)(2) expressly limits review to "the evidence presented in the State court proceeding"). This is in keeping with "[t]he federal habeas scheme[, which] leaves primary responsibility with the state courts." *Id.* at 182. And given AEDPA's "intent to channel prisoners' claims first to the state courts," it would not make sense "to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." *Id.*

Finally, we do not consider an issue that was not adequately raised in the federal district court. *See Simpson v. Carpenter*, 912 F.3d 542, 565 (10th Cir. 2018) ("[W]hen a litigant fails to raise an issue below in a timely fashion and the court below does not address the merits of the issue, the litigant has not preserved the issue for appellate review."); *see also Parker v. Scott*, 394 F.3d 1302, 1319–20 (10th Cir. 2005) ("We do not review these claims because [the applicant] failed to assert them in his district court petition for habeas relief."). "To properly raise an argument below, a litigant must present the argument with sufficient clarity and specificity." *Simpson*, 912 F.3d at 565 (internal quotation marks omitted). Any "vague, arguable references to a point in the district court proceedings do not preserve the issue on appeal because such perfunctory presentation deprives the trial court of its opportunity to consider and rule on an issue in any detail." *Id.* (ellipsis and internal quotation marks omitted).

## B. *Brady v. Maryland* Claim

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. To prevail on a *Brady* claim, the proponent must show that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008) (internal quotation marks omitted). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009).

Goode alleges that the prosecution violated *Brady* in withholding information about Jeff Henderson, one of the Tulsa Police Department officers investigating the murders. There is no doubt that Henderson was a bad cop. Nine days after Goode's second application for postconviction relief was filed in state court in July 2010, Henderson was charged in a 62-count federal indictment, accusing him of, among other things, falsifying search warrants, committing perjury, and engaging in witness tampering. He was convicted by a jury on two counts of civil-rights violations and six counts of perjury. *See United States v. Henderson*, 564 F. App'x 352, 354 (10th Cir. 2014).

At Goode's trial, Henderson testified to his discovery of two .22 casings and one live .22 round on a vacant lot across from the home of Damos "Peanut" Joseph. This discovery corroborated Bunny Thompson's testimony that after the murder the three culprits went to Peanut's home, where Goode instructed him to dispose of the bullets and casings in his .22 by tossing them in the lot.

Goode argues in this court that disclosure by the prosecution of Henderson's egregious misconduct would have helped the defense in two important respects. First, Goode describes Henderson's contribution as "vital." Aplt. Br. at 10. He contends that the prosecution's two main witnesses—Bunny Thompson and Michelle Chastain—had questionable credibility (both because of the impeachment of their testimony and the fact that they had stronger motives to commit the murders than did Goode) and there was little corroboration of their accounts. As a result, he concludes, the corroboration by an apparently honorable police officer (Henderson) could well have tipped the scales in

21

favor of a conviction; and his impeachment "could have been key to the defense." *Id.*

Second, Goode argues that disclosure of Henderson's misconduct would have

"reverberate[d] to all parts of the State's case," Aplt. Br. at 43, by undermining the

credibility of the State's other witnesses and suggesting that officers improperly targeted

Goode in their investigation.  He asserts that there is a reasonable probability that

introduction of evidence of Henderson's misconduct would have changed the result of

both his trial and his sentence.  But in federal district court Goode did not argue that

disclosure would have enabled him to undermine the entire prosecution (as opposed to

just impeaching Henderson); nor did he preserve an argument regarding the impact of the

alleged *Brady* violation on anything other than his *conviction* (not his sentence).

Therefore, we do not consider those matters.  *See Simpson*, 912 F.3d at 565.

Goode first raised a *Brady* claim in his second postconviction application to the

OCCA.  That claim spanned a total of two pages of the application.[6]  His barebones

---

[6]  Because of its brevity, we provide the entirety of Goode's *Brady* argument to the
OCCA:

### PROPOSITION ONE

**MR. GOODE'S DUE PROCESS RIGHTS WERE VIOLATED BY THE
PROSECUTION'S WITHHOLDING OF EVIDENCE RELEVANT TO THE
VERACITY AND CREDIBILITY OF ONE OF ITS WITNESSES, TULSA
POLICE OFFICER JEFF HENDERSON**

**A.  Standard of Review**

An appellate court reviews *de novo* claims that the prosecution violated <u>Brady v.
Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), including whether

22

suppressed evidence was material. <u>United States v. Hughes</u>, 33 F.3d 1248, 1251 (10th Cir. 1994).

## B. Argument and Authority

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In criminal prosecutions, that clause's primary guarantee is the right to a fundamentally fair trial. <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). The prosecution's suppression of evidence favorable to the accused violates due process where the evidence is material either to guilt or to punishment. <u>Brady</u>, 373 U.S. at 87, 83 S. Ct. 1194.

"[E]vidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Ritchie</u>, 480 U.S. at 57, 107 S. Ct. 989 (quotation and alteration omitted). A defendant need not show that the withheld evidence would have "resulted ultimately in [his] acquittal." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Rather, the touchstone is simply whether the ultimate verdict is one "worthy of confidence." <u>Strickler v. Green</u>, 527 U.S. 263, 290, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). "Impeachment evidence, . . . as well as exculpatory evidence, falls within the <u>Brady</u> rule. <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). <u>See</u> <u>Douglas v. Workman</u>, 560 F.3d 1156, 1174 (10th Cir. 2009) ("[E]vidence significantly enhancing the quality of the impeachment evidence usually will [be material.]").

Although the documents contained in App., Ex. 6 chronicle some of the more recent allegations leveled against Officer Henderson, other documents, documents which concern events that preceded Mr. Goode's December 2007 trial, also bear on Officer Henderson's credibility. For example, in January of 2002, Officer Henderson was suspended from the Tulsa Police Department for misusing his authority as a police officer to resolve a personal dispute. <u>See</u> App., Ex. 7. In December of 2000, Officer Henderson was investigated by the Tulsa Police Department's Internal Affairs Division for, among other things, entering false information in a probable cause affidavit. <u>See</u> App., Ex. 8.

## C. Conclusion

Evidence affecting Officer Henderson's credibility was known, or should have been known, to the state and because such evidence was material to an assessment of Officer Henderson's credibility, it should have been disclosed to Mr. Goode. It was not. <u>See</u> App., Ex. 9. Accordingly, this Court should find that the state violated its obligations

23

argument was that evidence of Henderson's misconduct was "known, or should have been known, to the state" and that "because such evidence was material to an assessment of Officer Henderson's credibility, it should have been disclosed to Mr. Goode." Def.'s Second APCR at 12–13. In support of his claim, Goode submitted affidavits by Damos "Peanut" Joseph and his wife alleging that Henderson stated he would manufacture evidence in Goode's case, and newspaper articles that described the ongoing investigation into Henderson's misconduct in other matters.[7] Goode also provided two internal police documents: an interoffice memorandum notifying Henderson of a two-day suspension for wrongfully using police power in a personal dispute, and a factual summary of an investigation into an incident of alleged excessive force (the summary is notably without legal conclusions).[8] Goode did not adequately argue before the OCCA (or in federal district court), as he does here, that the purported *Brady* evidence would have had resounding effects on the entire prosecution (as opposed to the evidence just impeaching Henderson and thereby leaving Bunny uncorroborated), or that the evidence could have affected his sentence.[9]

---

imposed by <u>Brady</u> and its progeny and Mr. Goode's sentences should be reversed and his case remanded to the district court for a new trial.

Def.'s Second Application for Post-Conviction Relief, PCD 2010-661, at 11–13 (July 9, 2010) (Def.'s Second APCR).

[7] We question, but have no occasion to resolve, whether this evidence was available to the prosecution and could have been disclosed to Goode by the time of trial.

[8] We also question, but need not resolve, whether this evidence had any significant impeachment value and could have been used by Goode at trial.

[9] One other argument we need not resolve that is raised by Goode in this court but was not raised before the OCCA is whether Henderson's personal knowledge of his own

24

The OCCA denied Goode's request for relief. It assumed that Henderson was "completely impeached," and concluded that even if "the evidence regarding these specific cartridges had been excluded from the trial, the outcome of this trial would have been the same." OCCA Opinion Denying Second APCR at 5–6 (Sept. 13, 2010). It explained:

> Goode's claims in this subsequent application are based on Tulsa Police Department's Detective Jeff Henderson and his publicized alleged illegal conduct, which came to light earlier in 2010 and led Petitioner to the discovery of alleged improper activity occurring prior to Goode's trial. First, Goode alleges that the State withheld critical evidence which was relevant to Henderson's veracity and credibility. . . .

> We need not determine whether the evidence proffered against Henderson is true and would have been relevant, admissible and sufficient to impeach Henderson's testimony, or whether the State failed in its duty to turn the evidence over to the defense. We conclude, after reviewing these claims, that even if Henderson's testimony was impeached or if the evidence found by Henderson was excluded from this trial, Goode would have suffered the same fate, beyond any doubt. The facts of this case are compelling.

> During the trial, witness and co-defendant Ronald Thompson testified that, after the murders, they took the guns to Damos Joseph's house. He testified that while parked at the house, he threw some .22 caliber rounds in a field. He obviously gave investigators this information, as Henderson was called to assist the Owasso police department by going to Damos Joseph's residence, meeting with Owasso Detectives, and requesting permission to search the Joseph residence. While there, Henderson testified that he found two spent .22 shell casings and a live .22 cartridge across the street in a lot 5–6 feet from the curb. He notified Owasso detective Bill Mozingo so he could view and recover the items. We briefly noted the finding of these items in our recitation of facts on direct appeal.

> These shell casings were not vital to the case against Goode, nor were they the only pieces of evidence corroborating Ronald Thompson's testimony. Thompson also testified that they threw latex gloves out of the car windows after the shooting, and latex gloves were found along the highway consistent with his testimony and statements to police. Thompson

misdeeds in other investigations can be attributed to the prosecution in this case for *Brady* purposes.

25

testified about the three different caliber of handguns used in the murders, and evidence supporting that testimony was found at the scene and during the autopsy examination.

After disposing of the guns, co-defendant Kenneth Johnson drove the trio to Michelle Chastain's house, and although she did not see Thompson, she saw his Walmart vest in the car and testified that Johnson drove Goode to her house, just as Thompson testified.

Not only was there plenty of additional corroborating evidence, besides the .22 caliber cartridges, Goode himself confessed to Michelle Chastain that he killed the victims. He even provided specific details of the murders. Needless to say, sufficient evidence existed, even absent evidence of these cartridges, to prove beyond a reasonable doubt that Goode was guilty of these crimes.

We conclude that, if Henderson's testimony had been completely impeached, or if the evidence regarding these specific cartridges had been excluded from the trial, the outcome of this trial would have been the same.

OCCA Opinion Denying Second APCR at 3–6 (footnotes omitted).

In reviewing the OCCA's decision, we are limited to the record that was before the state court.[10] *See Pinholster*, 563 U.S. at 181. The parties interpret the OCCA's decision as denying relief under the materiality prong of *Brady*, as do we. Given the relatively minimal value of Henderson's testimony in light of the other evidence introduced at trial implicating Goode in the murders and corroborating Bunny's and Michelle's incriminatory accounts, we cannot hold that the OCCA's decision was an unreasonable application of *Brady*.

Henderson's testimony, which consumed just nine of the more than 1000 pages of the trial transcript, was of little importance to the verdict. First, his testimony had only

---

[10] We therefore need not consider the documents from Henderson's trial that Goode presents to our court but did not present to the OCCA.

26

modest corroborative effect. Henderson accounted for two .22 casings found across from Peanut Joseph's home. But as defense counsel pointed out in closing argument (without dispute from the prosecutor), there should have been four, not two, .22 casings from the murders—two from the shots to the wall, one from the shot in Kayla's hip, and one from the projectile found in the dresser. In addition, Henderson acknowledged on cross-examination that it would not be that uncommon to find such casings on a vacant lot in the part of town where he found them.

Moreover, the evidence incriminating Goode was compelling. The testimony of Bunny and Michelle may have been enough to convince the jury, but there was much more. It is undisputed that Bunny was one of the culprits. It is hard to believe that he committed the crimes on his own, using three different firearms to kill the victims. Who else could have been involved?

The neighbors' testimony sets the time of the murders at about 12:45 a.m. on August 26. An undisputed video shows Bunny with Goode and Johnson at 10:00 p.m. on August 25 leaving the Walmart in Johnson's Mercury Marquis. And trial testimony placed the three men together again at Michelle's house at 4:18 a.m. (per Michelle's account), with Bunny in a stupor. (Recall also that Penny Avans testified that Michelle called her at 3:18 a.m. and said that Goode and Johnson had come to her home.) Even Goode admitted in his statement to the police that he was with Johnson and Bunny around 10:00 p.m., and that later that night he met Johnson and Bunny at Michelle's after Johnson called to say that something was wrong with Bunny, who, it turned out, was incapacitated. Is it reasonable to believe that Bunny, whose car was not operational,

27

somehow during this five- or six-hour window in the middle of the night hooked up with someone other than Goode and Johnson to commit the crimes and then fell into a stupor, only to be discovered by Goode, Johnson, or both?  Penny Avans, a defense witness, testified that she left Michelle at her house at about 12:10 a.m., in itself making Michelle's participation unlikely.

What about Johnson?  Goode told the police (in his second version of events) that he had gone home from the Walmart, leaving Bunny and Johnson together.  But it beggars belief to think that those two men, who had first met at 10:00 p.m., joined together in this heinous crime without any involvement of the man who brought them together—Johnson's old friend Goode, with whom he was connecting after a separation of one or two years.

This is to say nothing of the corroborating nontestimonial evidence and testimony from persons who could hardly be suspect (from Goode's point of view).  Long after Bunny had told the police that the men had gone to Peanut's home after the murders, a defense investigator obtained the records for Goode's cell phone, showing that a call had been placed to Peanut's phone at 1:03 a.m., some 20 minutes after the likely time of the murders.  That call ended a significant hiatus in the use of Goode's cell phone since 11:48 p.m., after a day of near-constant activity on the phone.  And Bunny's testimony regarding the trip to Peanut's home and the culprits' use of gloves is further corroborated by the discovery of gloves disposed of near the side of Highway 169, in particular a "blue and white work glove encased in a latex glove," Trial Tr. Vol VI at 1266, and the discovery of part of a latex glove in Johnson's vehicle.  Also, the forensic evidence

28

partially corroborated Michelle's testimony that Goode confessed to firing eight shots and, apparently, trying to shoot Mitch in the face.

In addition, Ruby Gilyard, who lived with Goode and his mother and was called as a defense alibi witness, testified that Goode had come home about 11:00 p.m., they had talked for a short while and then, after she took a shower and got ready for bed, the last she heard of Goode was his rummaging through things in another room—all consistent with his coming home to get the tools necessary for his "business" of the evening. (Both Bunny and Penny testified that he said that he had "business" to take care of that night.)

On top of this evidence is Goode's initial version of events when talking to police. Why, if there was nothing to hide, make up the story about driving to Mannford from the Walmart, when his memory of the events less than three days earlier must have been fresh?

Because of the minimal value of Henderson's testimony and the strength of the incriminatory evidence, we cannot say that it was unreasonable of the OCCA to determine that impeaching Henderson would not have had a reasonable probability of changing the outcome of Goode's trial.

Finally, Goode argues that the impeachment evidence, even if not enough on its own to establish materiality, is at least sufficient to require an evidentiary hearing regarding Henderson's activities and the extent of the prosecution's knowledge. But because we have not overturned the OCCA's decision as unreasonable, we cannot grant an evidentiary hearing. *See Smith v. Aldridge*, 904 F.3d 874, 886 (10th Cir. 2018). We affirm the district court's denial of Goode's *Brady* claim.

29

### C.    Ineffective-Assistance-of-Counsel Claims

Goode claims that he received ineffective assistance of trial counsel at both the guilt phase and penalty phase of his trial.  Trial counsel was allegedly ineffective at the guilt phase because (1) counsel did not interview or present testimony from Douglas Miller, a friend of the victims, about a jailhouse conversation with Bunny Thompson that would have impeached him; (2) counsel did not use a statement from Damos "Peanut" Joseph to the police that contradicted Bunny's account of disposing of evidence after the crime; and (3) counsel did not adequately pursue the possibility that Officer Henderson had planted evidence since they did not follow up on statements to police by Peanut's wife, Lashaun Joseph, or interview Peanut himself about the matter.  With respect to the penalty phase of the trial, Goode alleges that counsel failed to adequately investigate and present evidence of (1) his mental-health disorders, his being the victim of childhood sexual abuse, and his ongoing substance dependence; and (2) mitigating circumstances known to family, friends, and coworkers.

### 1.  Standards of Review

A defendant alleging ineffective assistance of counsel must show both that counsel's performance was deficient and that defendant was prejudiced thereby.  *See Strickland v. Washington,* 466 U.S. 668, 687 (1984).  Regarding the first prong, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Overcoming this presumption is a "heavy burden" for the defendant. *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal quotation marks omitted).  "To

30

be deficient, the performance must be outside the wide range of professionally competent assistance. In other words, it must have been completely unreasonable, not merely wrong." *Hooks v. Workman* (*Danny Hooks*), 606 F.3d 715, 723 (2010) (citation and internal quotation marks omitted). On the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court is not bound to consider these two prongs in order, or even to consider them both, if one is dispositive. *See id.* at 697.

The burden on the defendant is even greater when AEDPA applies. "[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal quotation marks omitted). Review for unreasonableness under § 2254(d) is different from review for unreasonableness solely under *Strickland*. *See id.* at 105. "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Our review of ineffective-assistance claims under § 2254, then, is "doubly deferential," deferring both "to the state court's determination that counsel's performance was not deficient and . . . to the attorney's decision in how to best represent a client." *Byrd*, 645 F.3d at 1168.

### 2. Analysis

#### a. Guilt-Phase Ineffective-Assistance Claims

31

### i.    Douglas Miller

Bunny was the key witness for the prosecution.  He admitted participating in the murders and testified to Goode's involvement.  Goode claims that competent defense counsel would have impeached Bunny's testimony with testimony from Douglas Miller about his conversation with Bunny while they were incarcerated in adjacent cells at the Tulsa County Jail after Bunny had been arrested for the murders.  After trial, Goode's appellate counsel obtained an affidavit from Miller about that conversation.  Miller said that he had been a friend of the murder victims and told Bunny as much.  In the jailhouse conversation Miller told Bunny he wanted to know the truth about the murders, and Bunny replied that he could not remember the night of the murders because he was high on Xanax and ecstasy.  He told Miller that when police investigators questioned him, they mentioned Goode and Johnson, so he went along with them and tried to place the blame on his two associates because he did not want to be suspected himself.

On direct appeal the OCCA rejected Goode's claim that counsel was ineffective in failing to impeach Bunny with Miller's statement.  It held that Goode had failed to present sufficient evidence that his trial counsel's performance had been deficient or that he had been prejudiced by the alleged deficiency.  Under the deference required by AEDPA, we cannot grant relief.

To begin with, Goode has presented no evidence that the defense team failed to interview Miller before trial, nor has he presented evidence that Miller would have reported the jailhouse conversation had he been interviewed at that time.  Goode's appellate counsel did not obtain the Miller affidavit until November 2008, 10 months

32

after Goode was sentenced. The affidavit says nothing about whether Miller had previously been interviewed, and Miller states in the affidavit that he had "failed to tell anyone about [the jailhouse conversation] due to not wanting to be in the middle of it." Miller Affidavit, Application for Evidentiary Hearing on Sixth Amendment Claims, PCD 2008–43, at Ex. A (Feb. 2, 2009).

Further, the OCCA ruled that testimony by Miller, even if believed by the jury, would not have changed the outcome of the trial. It noted that Bunny had been extensively cross-examined about his drug use during and after the murders and about his inconsistent statements to investigators. It also pointed out the obvious reason why Bunny would not have been truthful with Miller: Miller's friendship with the victims and Bunny's fear of retaliation if he admitted responsibility. *See Goode*, 236 P.3d at 687. The court ruled that Goode had failed to show deficient performance by counsel or the requisite prejudice. *See id*. We do not think that decision unreasonable.

Goode contends that the OCCA and the federal district court both improperly denied his requests for an evidentiary hearing on this issue. But on appeal in this court Goode does not dispute the State's assertion that he failed to raise in federal district court any claim that the state court had improperly refused to conduct an evidentiary hearing. And Goode does not present to us any ground on which the district court could properly have expanded the record beyond what was submitted to the state courts. *See Pinholster*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Accordingly, we reject this claim.

33

### ii. Damos "Peanut" Joseph and Lashaun Joseph

Bunny testified that he, Goode, and Johnson visited the home of Peanut and Lashaun Joseph shortly after the murders and disposed of his gun and ammunition there. Goode argues that trial counsels' performance was deficient in not using evidence from the Josephs to challenge the testimony of Bunny and Officer Henderson, who testified that he found bullet casings near the home.

First, Goode points to the failure of trial counsel to impeach Bunny's testimony with a police report of an interview with Peanut. According to the report, Peanut said that Goode and Bunny came by his home about 9:00 a.m. on the morning of the murders (but not promptly after the murders), and the two men asked for help moving a chain saw and automobile parts. He denied receiving guns or ammunition. Goode fails, however, to explain how defense counsel could have used the report at trial. The report itself was clearly inadmissible hearsay. The only way to present the information at trial would have been for Peanut to testify. But Goode provides no evidence that Peanut had not been interviewed by anyone on the defense team or that he would have been willing to testify on that issue. (As we shall see shortly, he explicitly stated in an affidavit that he had not been willing to testify about information that would have impeached Henderson.) It is not deficient performance for counsel to fail to put on inadmissible or unavailable evidence. *Cf. Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004) ("[I]f the issue is meritless, its omission will not constitute deficient performance." (internal quotation marks omitted)). Goode has failed to establish the first prong of *Strickland* with respect to this evidence.

34

Next, Goode argues that defense counsel were deficient in failing to follow up with Peanut and his wife Lashaun about various statements made to them by Henderson while police searched their property after the murder. Because of this deficiency, Goode argues, the defense failed to "get to the bottom of" Henderson's corruption. Aplt. Br. at 100. His brief states, "While [at the Josephs' home] the corrupt Henderson made multiple statements indicating his determination to 'get' Clarence Goode by legal or illegal means and his intention to plant evidence against him." *Id*. at 99. He points out that it was Henderson who corroborated Bunny's testimony that he had disposed of the shell casings from his gun near the Josephs' home when Henderson found two .22 shell casings and a .22 cartridge in the neighboring quarter-acre lot.

Goode submitted affidavits from the two Josephs with his second application to the OCCA for postconviction relief. Peanut's affidavit stated that Henderson told him: "[W]e have been after Clarence for a long time and we are going to get him one way or another. He let me know he was going to get Clarence any way he needed to." Damos Joseph Affidavit, Def.'s Second APCR at Ex. 4. But Peanut also said that even though he talked to a few members of Goode's trial team, "I was afraid to testify at that time because I believe Officer Henderson would have retaliated against me. . . . I am now willing to sign this affidavit because I no longer fear Officer Henderson because of all his leagal [sic] trouble." *Id*. It is not deficient performance to fail to call a witness who will decline to provide useful testimony. We reject this component of Goode's ineffectiveness claim.

As for Lashaun, she submitted an affidavit saying that had she been asked she would have told trial counsel about Henderson's intimidation and threats regarding Goode. But Goode does not argue that trial counsel should have called her as a witness. As we understand his argument, he simply states that if Lashaun had been interviewed, her comments about Henderson would have led competent trial counsel on the path that "very well may have broken the case wide open and exposed to the jury a veteran police officer who fabricates evidence." Reply Br. at 36. This is sheer speculation, particularly given that there was no publicly available evidence of Henderson's corruption at the time of trial.

Moreover, even if defense counsel had been deficient in not pursuing from the Josephs potential evidence that could have been used to impeach Henderson, Goode has not established the prejudice required by *Strickland*'s second prong—for the reasons discussed above with respect to Goode's *Brady* claim. This claim thus fails.

### b. Penalty-Phase Ineffective-Assistance Claims

#### i. Drug Use, Child Sexual Abuse, and Mental Health

In Goode's first state postconviction proceeding he argued that his trial counsel were ineffective at the penalty phase of his trial for failing to present in mitigation available evidence of his abuse of Xanax and the sexual abuse he suffered as a child. And he contended that his appellate counsel were ineffective for failing to raise these issues on direct appeal. The OCCA rejected the claims on the second prong of

*Strickland*, holding that the failure to present the evidence did not prejudice Goode. It

said:

> There was no evidence that Goode was under the influence of Xanax at the
> time of these crimes and Goode presents no new evidence indicating that he
> was. Also, Goode has presented no evidence regarding the effect of his
> childhood experiences on him specifically. Without these pieces of
> evidence, Goode cannot show that the outcome of his trial would have been
> different.

OCCA Opinion Denying Original Application for Post-Conviction Relief, PCD 2008–

211, at 8 (Sept. 7, 2010).

Goode raises three challenges to the OCCA's decision. First, he argues that Dr.

Manual Saint Martin, a psychologist, provided the connection between the sexual abuse

and Goode's behavior resulting in the murders. But no statement by the doctor was

presented to the OCCA in the first postconviction proceeding.

Second, Goode argues that the OCCA applied the incorrect test for assessing

prejudice under *Strickland*. He points to the OCCA's language that Goode had failed to

prove that "the outcome of his trial would have been different" if the additional evidence

had been presented. OCCA Opinion Denying Original Application for Post-Conviction

Relief at 8. Goode is correct that the proper *Strickland* test is "whether there is a

*reasonable probability* that, but for counsel's unprofessional error, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added).

But the OCCA's use of imprecise shorthand in stating the test does not demonstrate that

the OCCA was unaware of the correct standard. On the contrary, its discussion of the

ineffective-assistance claims began with citations to both *Strickland* and *Harris v.*

*Oklahoma*, 167 P.3d 438, 441 (OCCA 2007), which stated the *Strickland* reasonable-probability standard. Goode has not overcome the presumption that the state court knew and applied the proper standard. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (we presume "that state courts know and follow the law," and we give state-court decisions "the benefit of the doubt"). This is not one of those "extreme malfunctions" in the criminal-justice process that can support habeas relief. *Harrington*, 562 U.S. at 102–03 (internal quotation marks omitted); *see Grant v. Royal*, 886 F.3d 874, 906 (10th Cir. 2018) ("The true question presented . . . is simply whether the overall substance of the OCCA's analysis, as well as the result it reached, reflects that the court understood and decided the ineffective-assistance issue under the proper *Strickland* framework."). Moreover, as discussed below, the OCCA rejected an expanded version of this same claim in Goode's third state postconviction application and quoted the correct *Strickland* test in the process.

Third, Goode argues that the OCCA's analysis is contrary to *Eddings v. Oklahoma*, 455 U.S. 104 (1982), in requiring him to show a causal nexus between the purported mitigation evidence and an adverse effect upon him at the time of the crime. *Eddings*, however, was not an ineffective-assistance case. That opinion held only that the sentencing judge in a capital case cannot refuse to consider relevant mitigating evidence just because it did not provide a legal excuse from criminal responsibility. *See id.* at 113–17. The Court made clear, however, that the sentencing and reviewing courts "may determine the weight to be given relevant mitigating evidence." *Id.* at 114–15. Here, the OCCA did not refuse to consider the drug-use and sexual-abuse evidence; rather, it held

38

that the evidence was entitled to minimal if any weight. That determination was not contrary to *Eddings*. We therefore need not address the State's argument that Goode failed to preserve this issue in federal district court. We conclude that the OCCA did not unreasonably apply established federal law in rejecting this claim in Goode's first postconviction application.

Goode also challenges the OCCA's rejection of an expansion of this claim in his third state postconviction application. He argues that the performance of trial counsel was deficient because they possessed "critical records" documenting Goode's diagnosis and treatment for mental-health conditions, including depression and anxiety, yet they failed to pursue this evidence and raise his mental-health problems in mitigation at the penalty phase of his trial. Aplt. Br. at 66. He contends that proper consideration of those records "would have led to the discovery of Goode's prior diagnoses and treatment for mental health problems." *Id*. at 67. And, the argument continues, defense counsel could then have obtained expert testimony for the penalty phase. To show what an expert could have testified to, Goode presented to the OCCA a report from Dr. Saint Martin, stating that Goode had "confirmed diagnoses" of "major depression, post-traumatic stress disorder and benzodiazepine (Xanax) and alcohol dependence," and that all but Xanax were "present at the time of the offense and they would have significantly impacted Mr. Goode's behavior." R., Vol. 1 at 240. The report asserted that Xanax and alcohol can each cause "dis-inhibition, cognitive dysfunction[,] lowered impulse control and euphoria." *Id*. at 241. It further noted that Goode's fiancée and his mother reported that Goode had been sexually abused as a child, and that this abuse, "followed by witnessing

39

numerous shootings, death of friends, gang violence and his own violent injuries," "could result in" chronic PTSD and "would lead not only to heightened levels of anxiety, but also to poor cognitive functioning and poor coping abilities." *Id.* at 241–42. It also stated that his psychiatric history suggested possible "diagnoses of temporal epilepsy, bipolar disorder, and intermittent explosive disorder." *Id*. at 242.

The OCCA rejected the claim as procedurally barred. We need not worry whether this procedural bar binds us because the OCCA essentially resolved the substantive issue now before us while deciding the procedural bar. It said that the procedural bar could be overcome if Goode's counsel in the first postconviction proceeding had been ineffective in failing to raise the claim presented in the third postconviction application. It then held that counsel had not been ineffective because the new claim failed for lack of a showing of prejudice. The OCCA ruled that Goode had not shown "a reasonable probability that the evidence would have impacted the jury's weighing of the aggravating and mitigating evidence." It explained:

> The evidence of mental health issues caused by Goode's chronic substance abuse and a history of exposure to a violent environment could lead the jury to a negative perception of Goode just as easily as the jury might find it mitigating. This evidence, moreover, would have exposed Goode's deeply ingrained involvement in violent gang activity, including shootings, stabbings, drug dealing, and other nefarious activities.

> This evidence, combined with the violent nature of the crime, the gratuitous killing of an entire young family in an attempt to garner some type of revenge, while seeking another intended target, would not have caused this jury to determine that the mitigating evidence outweighed the aggravating circumstances. The evidence would have bolstered the fact that Goode is a continuing threat to society.

40

OCCA Opinion Denying Successive Application for Post-Conviction Relief, PCD 2012–261, at 5 (May 9, 2012) (citation omitted).

We review that ruling with deference. *Cf. Grant*, 886 F.3d at 910–11 (reviewing prejudice prong of ineffective-assistance claim de novo because OCCA did not resolve claim on that ground, but deferring to the OCCA's "related, but distinct . . . merits determination" that defendant was competent in holding that applicant was not prejudiced by counsel's failure to monitor his competency). And the OCCA's analysis is not an unreasonable application of the prejudice prong of *Strickland*. The essence of Goode's argument is that the possible downside to psychological evidence does not mean that it cannot be helpful. True. But one must look at the particular circumstances. And the circumstances here do not help Goode. First, he does not argue that treatment of his mental disease would reduce his dangerousness. The report by Dr. Saint Martin does not address the issue. *Cf. Littlejohn*, 704 F.3d at 865 & n.24 (report by psychiatrist stated that defendant's deficits were treatable and thereby provided "some assurance that, through medical treatments, his criminal, violent past would not be prologue"); *Wilson v. Sirmons*, 536 F.3d 1064, 1094 (10th Cir. 2008) (separate opinion of Judge McConnell) (stating that juries are likely to regard as particularly mitigating those mental diseases associated with brain abnormalities that can be treated with medication). Second, the psychological report added considerable information about Goode's violent, antisocial past. He argues in his reply brief that the jury had already been exposed to a good deal of evidence of such misconduct. That evidence, however, related only to Goode's feud with J.R. Hoffman and Mitch Thompson (in which Goode injured them only with his fists and

41

used a gun only to try to stop Mitch from beating up Bunny), his prior conviction for possession of a firearm by a convicted felon, and the crimes charged in this case. The jury was told nothing of his gang involvement or violent youth. The psychological report established that the violent conduct in this case was not a one-off brought about by a particular episode but a way of life. Thus, this case is readily distinguishable from *Smith v. Mullin*, 379 F.3d 919, 943 & n.11 (10th Cir. 2004), where the "aggravating edge" to the defendant's mental impairments was already squarely before the jury. The OCCA could therefore reasonably determine that the new mental-health evidence was unlikely to have affected his sentence. Giving the OCCA decision the deference it is due, we cannot grant relief on this claim.

### ii.    Additional Mitigation Witnesses

Goode argues that defense counsel provided inadequate representation by presenting at the penalty stage of his trial only two mitigation witnesses—his mother and his fiancée. This testimony, along with the first-stage testimony of coworker Teresa Sharpe, constituted his mitigation evidence. Goode claims that the jury should also have heard helpful evidence from coworkers, friends, and family. Goode first raised this claim on direct appeal and attempted to supplement it in his first and third postconviction applications.

On direct appeal Goode contended that his trial counsel were ineffective in not presenting additional family members (including two of his children), friends, and coworkers as mitigation witnesses. He submitted affidavits from the witnesses and argued that their testimony "could have rounded out the jury's picture of [his] overall

character and history." Aplt. Br. at 76, *Goode v. State*, No. D-2008-43. The OCCA

rejected the argument for lack of prejudice:

> Goode cannot show that he was prejudiced by the absence of additional mitigating evidence. Most of the information provided in the affidavits was presented to the jury. Goode's mother and fiancé testified about his good family background, his childhood, his participation in high school sports, and his devotion to his family and children. Goode's coworker testified about his employment and his ability to assist patients in the mental health ward at the hospital.
>
> One affidavit describes Goode as coming from a good home, but upon reaching his teen years he began getting into trouble because he was influenced by peers. Affidavits from Goode's children describe their life with Goode in a very positive light. Coworkers' affidavits also describe him as a good worker. Other friends describe Goode as a good person while around them. Much of Goode's proposed additional mitigation evidence was cumulative to that presented to the jury. Even if trial counsel had presented all of the mitigating witnesses now proposed, there is no reasonable probability that the outcome of the trial would have been different.

*Goode*, 236 P.3d at 688.

In his first postconviction application, Goode again argued that counsel was

ineffective in failing to present additional mitigation witnesses. Three of the affidavits

submitted in support of that claim—those by his children and his friend Penny Avans—

were similar to those submitted on direct appeal, and the OCCA accordingly held that

"the argument regarding these potential mitigation witnesses is barred." OCCA Opinion

Denying Original Application for Post-Conviction Relief at 7. The remaining affidavits

setting forth allegedly mitigating evidence recounted Goode's Xanax use and sexual

abuse as a child and were rejected by the OCCA for the reasons described above.

43

In his third postconviction application, Goode submitted affidavits from friends and family members disclosing that he had been involved in gang activity, lost close friends to gang violence, was shot in the face in a drive-by shooting, and grew up in a violent neighborhood with a father who abused alcohol. The OCCA rejected this additional evidence as procedurally barred but, as previously described, went on to examine whether Goode had presented a claim of ineffective assistance of postconviction counsel that would excuse the procedural bar.[11] The OCCA denied that claim for lack of prejudice, holding that "[t]he evidence of . . . Goode's . . . exposure to a violent environment could lead the jury to a negative perception of Goode just as easily as the jury might find it mitigating" and "would have exposed Goode's deeply ingrained involvement in violent gang activity." OCCA Opinion Denying Successive Application for Post-Conviction Relief at 5.

In this court, Goode relies on an amalgamation of the alleged mitigating evidence presented at various proceedings before the OCCA. He states that his hospital coworkers could have described how calm he was when working with emotionally unstable and potentially volatile patients; his children could have described him as a loving, encouraging, and generous father; and additional friends and family members could have described the rough neighborhood where he grew up and where he was traumatized by gang violence that took the lives of close friends and injured him, including a gunshot to

---

[11] Consideration of ineffective assistance of postconviction counsel was undertaken by the OCCA purely as a matter of state law. We doubt that the Supreme Court would consider such ineffective assistance as cause to overcome a procedural bar. *See Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017).

the face.  Friends and family, he says, could also have described his father, who "became mean when he was drunk" and drank often, passing out nearly every day; who would "talk crazy" to Goode's mother; and who behaved in such a controlling manner that he once disabled the family vehicle so the mother and children could not leave.

We see no basis for determining that the OCCA unreasonably applied *Strickland* in rejecting Goode's claims based on the failure to investigate and present this additional evidence during the penalty phase of the trial.  It was not unreasonable to hold that the evidence presented as part of Goode's direct appeal was largely cumulative of that presented at Goode's sentencing and that omission of that evidence was not prejudicial. *See James v. Gibson*, 211 F.3d 543, 557 (10th Cir. 2002) (no prejudice when "[m]uch of the [omitted mitigating] evidence [defendant] now points to was already before the jury").  Nor was it unreasonable to decide that testimony bringing Goode's violent past to light (which would be in considerable tension with the normal-family evidence) was unlikely to do more good than harm.  *See Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009) ("[W]hatever mitigating effect such evidence might have had if presented, it is just as likely the jury would react negatively to it." (internal quotation marks omitted)); *Davis v. Executive Director of Dep't of Corr.*, 100 F.3d 750, 762 (10th Cir. 1996) (failure to present mitigating evidence was not prejudicial when the evidence "if presented, would have constituted . . . a two-edged sword" (internal quotation marks omitted)).

We uphold the OCCA's determination as reasonable.

### D.    Cumulative Error

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (internal quotation marks omitted).  In conducting a cumulative-error analysis, we include prejudice that has already been assessed in denying claims, such as claims under *Brady* or claims of ineffective assistance of counsel that incorporate a prejudice component in determining whether a right has been violated.  *See id.* at 1207.  We have granted relief when the errors had an "inherent synergistic effect" on the outcome.  317 F.3d at 1221.

Goode argues that he suffered prejudice from the cumulative effect of counsel's alleged deficiencies at his guilt and sentencing phases.  He contends that "[t]he synergy between a bad cop, an awful witness, [and] a prosecution case aimed at propping them up" warrant relief for cumulative error.  Aplt. Br. at 105–06.

He asks us to include in the analysis an alleged error that we have not considered in this opinion because we declined to grant a COA on the issue—the improper admission at trial of a 911 call from Ms. Smalygo when she discovered the murders.  But the OCCA ruled that the call was inadmissible (although not prejudicial) under state law, not as a constitutional matter.  *See Goode*, 236 P.3d at 680–81.  And Goode has not argued in this court that the admission of the call into evidence was a constitutional error.  We therefore need not consider it in our cumulative-error analysis.  *See Matthews v.*

46

*Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) ("In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors[.]")

That leaves the claims that we have disposed of solely on prejudice grounds: Goode's *Brady* claim and his claims that counsel were ineffective in (1) failing to interview Lashaun Joseph, (2) failing to present evidence of Goode's mental health and sexual abuse, and (3) failing to present additional mitigation witnesses. But we have already determined that these alleged errors were not independently prejudicial and we see no "inherent synergistic" or other cumulative effect that would call for relief, given the limited value of Henderson's testimony and the doubtful usefulness of the evidence omitted as the result of alleged deficient performance by counsel, to say nothing of the compelling evidence against Goode. We therefore deny the claim of cumulative error.

## IV. CONCLUSION

We **AFFIRM** the district court's denial of Goode's application for relief under 28 U.S.C. § 2254.